**Margaret Rose GLADNEY, Plaintiff,**

v.

**Dr. Joab THOMAS, President of the University of Alabama, Defendant.**

**Civ. A. No. 82–G–2150–W.**

United States District Court, N.D. Alabama, W.D.

June 23, 1983.

Jack Drake and Brenda See, Drake, Knowles & Pierce, Tuscaloosa, Ala., for plaintiff.

Paul E. Skidmore, University, Ala., for defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

Plaintiff, Dr. Margaret Rose Gladney, an Assistant Professor in the College of Arts and Sciences, brought this action against Dr. Joab Thomas, President of the University of Alabama, pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1343(3) and (4), and 28 U.S.C. § 1331, claiming that the University's denial of her petition for tenure violated her guarantees of due process and equal protection of the laws contained in the constitutions of both the United States and the State of Alabama, and constituted a breach of contract.

Professor Gladney joined the University's faculty in 1974 as an Assistant Professor. She had, by that time, earned the M.A. degree in English from the University of Michigan and the Ph.D. in American Studies from the University of New Mexico.

Dr. Gladney's initial appointment was a joint one in the College of Arts and Sciences and in the New College. The New College is an experimental division of the University that permits students a greater degree of freedom in formulating their courses of study than is found in the other, more traditional divisions. For example, if

a student wanted to become a museum administrator, and the University did not offer that as a major course of study, the student could propose this course to the New College. The proposal would doubtless include courses from the College of Arts and Sciences as well as the College of Commerce, perhaps even law. Typically, enrollment in one college limits the number of hours one can take in other colleges. The New College has no such limitations and invites proposals that would be barred from other colleges which do have them. Indeed, the reason for creating the New College was to create courses of study not found elsewhere.

Because of the innovative character of the New College, there is an emphasis on teaching and advising. Students formulate their own courses of study and submit them to the College for approval. These proposals must be reviewed; their academic quality and legitimacy must be verified. The New College seeks to assure that its students truly need an alternative curriculum and do not merely seek to avoid the rigors of the traditional ones found in other colleges. Thus, as was stated in Professor Gladney's original appointment in the New College, there is an emphasis on teaching and advising. It was in this experimental environment that Professor Gladney initially spent half of her time.

Dr. Gladney also held a half-time appointment in the American Studies Program during the first years of her appointment. The program, though a part of the College of Arts and Sciences, is not typical of that College's divisions. Most significantly, it is not a department (as are most of the College's constituent divisions) but a program. As a program, it offered a range of American studies courses, but relied heavily on courses from other departments to fulfill the requirements for a major in American Studies. History, English, art history, and political science are among the departments whose courses are a part of the American Studies core curriculum. The program is interdisciplinary. Its chief mission is teaching. On June 15, 1978, after four years of dual service, the plaintiff's joint appointment was ended and she was made a full-time member of the American Studies program.

As a full-time member of the American Studies program, Dr. Gladney has, over the years, taught ten different courses; she developed eight of them. She has been evaluated by the students and consistently found to be an excellent teacher.

What is chiefly at issue here, however, is not Dr. Gladney's teaching or service, but her research. She was denied tenure because her publications were found wanting. She argues that she has met the objective research criteria set out in the University handbook.

The three criteria in retention and promotion decisions are teaching, research and service. The New College and American Studies require that the primary focus of their faculties be upon teaching. The program in American Studies Promotion and Tenure Standards and Procedures reads, in pertinent part, as follows:

III. Tenure and Promotion Criteria

1. Teaching. Ability and accomplishment in teaching is a primary criteria [sic] for the awarding of tenure ....

2. Research. While somewhat less significant than teaching, evidence of productive research is also a major criteria [sic] for tenure in American Studies.

3. Service. Service to the Program (above that normally expected), the College, the University, and to the community is considered by the American Studies Program to be an important activity. Such contributions properly documented will be accorded status equal but not in place of, teaching and research.

Professor Gladney developed a scholarly interest in Lillian Smith, the Southern born publicist and woman of letters who lived from 1897 to 1966. Miss Smith obtained international recognition with the publication of *Strange Fruit* in 1944, a novel concerning an interracial romance in a small Southern town. A daring subject for

its time, the book was "banned in Boston." Other works, such as the autobiographical *Killers of the Dream,* and the posthumous publication of *The Winner Names the Age,* a collection of speeches, essays and occasional pieces, are explorations of the subject to which Miss Smith gave her sustained attention throughout her career: race relations.

Dr. Gladney published articles and delivered papers on the life and work of Lillian Smith. Her first article appeared in 1979 in the "Southeastern American Studies Association Proceedings." A second article, accepted for publication in 1981, appeared in "The Journal of American Culture" in 1982. Also in 1981, an article entitled "Lillian Smith's Hope for Southern Women" was accepted for publication in the journal "Southern Studies."

In addition to her work on Lillian Smith, Professor Gladney co-authored a chapter in *Teaching Women's Literature,* and published an article with the Center for the Aging. All of the publications mentioned here were refereed—reviewed by a scholarly editorial panel for merit and deemed worthy of publication.

In 1980, Dr. Gladney applied for tenure. The tenure review process operates at three levels: (1) the department or program; (2) the school or college; and (3) the president and the board of trustees. In 1980, at the department level the Tenure Review Committee voted five to zero to recommend tenure. The College Committee voted against tenure; Dr. Douglas Jones, Dean of Arts and Sciences, concurred. Dr. Roger Sayers, Vice-President of Academic Affairs, extended plaintiff's contract, giving her an additional year in which to earn tenure. Normally, a final decision on whether or not to grant tenure is made during a faculty member's sixth year of employment. A denial of tenure is effectively a one-year notice of termination. Even though Professor Gladney had been a University faculty member for seven years at the time of her initial consideration for

tenure in 1980–81, only three of those years were spent full time in the College of Arts and Sciences. Her dual appointment in colleges with different standards made evaluating her tenure portfolio difficult. The Committee found that she did not meet the college standard for publication. In New College, however, publication is secondary to teaching and advising. Faced with this dilemma, Dr. Sayers, in a letter dated April 9, 1981, suggested that a final decision on tenure be deferred and plaintiff's contract be renewed for another year during which time she would be permitted to bolster her publication record and be considered for tenure again in 1982.

Realizing the delay in actual publication even after an article or essay has been accepted, Dr. Sayers noted in his April 1981 letter that:

> in consideration of the short period of time from now until the review for tenure starts next fall, you may wish to secure outside review of materials that you intend to submit for publication but, because of shortness of time you do not expect to be published before tenure consideration begins.

Thus the Academic Vice-President recognized that it would be possible in the intervening year to raise her scholarship evaluation to a satisfactory level without necessarily having work in print. What was anticipated was evaluation of Professor Gladney's work in progress.

What was actually produced between the deferral of tenure consideration and the 1981–82 tenure review was not simply a glimpse of Professor Gladney's work in progress—pages from her manuscript—but two articles accepted for publication in refereed journals. Even though the plaintiff went beyond the stated expectation of the Academic Vice-President and had two articles placed in scholarly journals, support at the program level declined from five to zero in favor of tenure in 1981 to three to two in 1982.[1] Assistant Dean of Arts and

---

**1.** It should be noted here that, because of the small size and the character of the American Studies program, the program committee is composed mostly of persons from outside it.

Sciences Reid Badger, and Dr. Bill Barnard of History, who voted for tenure the year before, voted against it in 1982. Dean Jones concurred. On April 20, 1982, Dr. Sayers wrote to Dr. Gladney denying tenure and terminating her employment effective May 15, 1983.

## BREACH OF CONTRACT

The plaintiff alleges that the University breached plaintiff's employment contract, using two analyses. First, it failed to award her tenure after she had complied with the published criteria for it. Secondly, the University failed to honor Vice-President Sayers' letter of April 1981 which said if plaintiff complied with the program criteria she would be awarded tenure. The court agrees with the second approach and therefore need not consider the first.

In 1981, when the University deferred decision on tenure and extended plaintiff's employment for another year, it told the plaintiff that it would be possible for her to bring her research work up to an acceptable level. This is the necessary implication of the letter. If it was not possible for the plaintiff to shore up her publications in one year, then there would have been no reason to grant an extension and reconsider her for tenure. If it was possible for plaintiff to improve her research and writing in one year, then she did. If it was impossible to raise her publications to an acceptable level and the University, knowing this, concealed the fact and told her otherwise, then it was an act of bad faith. The court assumes that the University acted in good faith in deferring the tenure decision, and that it was possible for the plaintiff to fulfill the tenure requirement in the one-year extension period. Actually, there was only a period of six to seven months from the Sayers letter to the commencement of tenure consideration during the next school year.

It is uncontroverted that all plaintiff needed to meet the requirements for tenure was increased publication. Plaintiff fulfilled the requirement by publishing two articles in refereed scholarly journals in her field. There have been criticisms of the quality of her publications and the academic repute of the journals. Dr. Dwight Eddins of the English Department testified that the plaintiff's essays were "descriptive, journalistic pieces." Perhaps this is so, but it is the work she has set out to do, and it is in the manner of work being done in the field of American Studies. The academic integrity of the American Studies program is not on trial. Doubtless it is a point on which people may differ. Given the nature of the field and the fact that topics and methods shunned by other areas of study have found a home in American Studies, the court must determine whether the plaintiff's work meets the standard of that program. The plaintiff has not sought tenure in the Departments of English or History, but in the American Studies program, and it is the standards of that program which must apply.

The testimonies of the Professor of English, Dwight Eddins, and the Professor of History, Bill Barnard (who characterized the American Studies journals in which plaintiff published as "peripheral, regional journals," and at another point as "fun journals") were not so much critical of the plaintiff's work as certain that what the plaintiff did and the area in which she worked would not be accepted as scholarship if it were done in their departments.

The plaintiff's work, installments of which are before the court, is a well-written, well-researched presentation of the life and work of Lillian Smith. Professor Gladney's scholarly pursuit is the telling of Miss Smith's story. In the area of American Studies, the telling of this story is a legitimate academic pursuit. The court finds it is work of sufficient quality to fulfill the requirements for tenure set out in the American Studies program.

Dr. Jim Salem, who has the rank of full professor in American Studies, testified that Dr. Gladney's progress had been informally monitored all along by various grant and prize committees. Professor Salem

Members of the History and English Departments served on the committee.

said, "if there was a prize, she got it. If there was a grant, she got it." The facts support the statement. Professor Gladney has received a University Research Committee grant, two University Presidential Fund grants, and a National Endowment for the Humanities grant. Though these grants vary in size and prestige, taken together they are evidence of the scholarly worth of the plaintiff's undertaking. The court finds that the plaintiff has met the criteria for tenure in the American Studies program.

The court bases its judgment that the plaintiff has been unlawfully denied tenure on its finding of a breach of contract. The April 9, 1981, letter from Dr. Sayers extending her employment for a year was an agreement not guaranteeing her tenure with the passage of time, but a deferral of decision that permitted her time to cure what was determined to be a weakness in her publications. The court further finds that the granting of an additional year did not only give plaintiff the standard number of years in one department for tenure consideration, it also said that it would be possible to present a satisfactory publication record in the ensuing year. The court construes the Dr. Sayers letter of April 9, 1981, to be more than a gesture resolving procedural questions about the plaintiff's term of service in one department. *See Landale Enterprises v. Berry*, 676 F.2d 506, 508 (11th Cir.1982). It was an extension of time, granted in good faith, that permitted a young scholar to make recognizable improvements in her publications. The court also finds that, according to the Sayers letter, it was possible for the plaintiff to bring her scholarly work up to a satisfactory level in the ensuing year, and that the plaintiff actually did so.

Even after the plaintiff was made a full-time member of the Arts and Sciences faculty, she labored under somewhat ambiguous tenure criteria. The full-time appointment in Arts and Sciences did little to clarify the ambiguity because, like the New College tenure criteria, the American Studies program criteria differed from that of most Arts and Sciences programs. Ameri-

can Studies stressed teaching, rather than scholarship.

Professor Gladney was told by the University's highest authorities on tenure matters that she was qualified for tenure in every way except one—scholarship. She was granted a year in which to improve her scholarship. There are only two ways to interpret the one-year extension of her contract: either (1) it was impossible for her to raise her scholarship to an acceptable level in one year, or (2) it was possible to raise her scholarship to an acceptable level in the course of a year. If the University required the impossible, then the requirement would shock the conscience of the chancellor, who would be duty-bound to set it aside, giving the force of law to the public policy against requiring the impossible. *Compare Lovoy v. Ratliff*, 276 Ala. 156, 159 So.2d 857 (1963); *Dixson v. C & G Excavating, Inc.*, 364 So.2d 1160, 1162 (Ala.1978). If it was possible to make sufficient improvements in one year, then the court finds as a conclusion of fact that Professor Gladney made them. Testimony from noted scholars in the field of American Studies attests to this. Professors James Salem, Elizabeth Meese, and Jacqueline Hall all testified that the plaintiff produced quality scholarship. Letters of support from scholars such as Professor Paul Gaston add further credence to this finding. The testimony made it clear that it was remarkable indeed to have accepted in refereed journals two articles in such a short time. This fact is implicit in Dr. Sayers' letter. Thus, the court finds that Dr. Margaret Rose Gladney has fulfilled all the requirements for tenure in the American Studies program of the College of Arts and Sciences at the University of Alabama, University, Alabama. *Cf., Bruno v. Detroit Institute of Technology*, 51 Mich. App. 593, 215 N.W.2d 745, 66 A.L.R.3d 1011 (1971). Though the court finds that plaintiff has colorable constitutional claims, the issues need not be reached. The court reserves judgment on them.

The court is of the opinion that plaintiff should be granted tenure. A separate or-

der in conformity herewith is being entered.

## FINAL ORDER

After a full trial before the court, and in conformity with the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that final judgment be and it hereby is ENTERED in favor of the plaintiff and against the defendant, and the plaintiff is ORDERED TENURED FORTHWITH as a faculty member of the American Studies Program in the College of Arts and Sciences at the University of Alabama, University, Alabama, and accorded all the rights, privileges and responsibilities thereunto appertaining. Costs are hereby taxed against the defendant.